IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JOSEPH F. JILES,

        Plaintiff,

v.                                                          ORDER

MARTHA BREEN-SMITH, SARAH COOPER,          08-cv-464-slc
WILLIAM POLLARD, PETE ERICKSEN,
STEVEN SCHMIDT, TODD HAMILTON,
MICHAEL BAENEN and MARK ZIMONICK,

        Defendants.

---

In this civil action brought under 42 U.S.C. § 1983, plaintiff Joseph F. Jiles contends that defendants Martha Breen-Smith, Sarah Cooper, William Pollard, Pete Ericksen, Steven Schmidt, Todd Hamilton, Michael Baenen and Mark Zimonick[1] violated his right to be free from cruel and unusual punishment under the Eighth Amendment by denying him adequate clothes, a mattress, soap, tooth brush and all other hygiene items and requiring him to sleep on concrete in front of a cool air vent. Also, plaintiff contends that defendants violated his rights to procedural due process under the Fourteenth Amendment by placing him on a behavior action plan without first affording him a hearing. Now before the court is defendants' motion for summary judgment.

I will grant defendants' motion with respect to plaintiff's claim that defendants violated his Eighth Amendment rights because plaintiff has adduced no evidence that defendants' mental state was consistent with deliberate indifference, as required to prove such a claim. Also, I will

---

[1] In plaintiff's complaint, he identified defendants as Martha Breen, Sarah Cooper, William Pollard, Pete Ericksen, Steven Schmidt, Todd Hamilton, Mark Baenen, and Mark Zimonick. In their summary judgment materials, defendants have corrected two of the defendants' names: Martha Breen-Smith and Michael Baenen. The caption has been amended accordingly.

grant defendants' motion with respect to plaintiff's due process claim because plaintiff had no liberty interest in avoiding placement on the behavior action plan.

From defendants' proposed findings of fact, plaintiff's response to those facts and the record, I find the following facts to be material and undisputed.

UNDISPUTED FACTS

Plaintiff Joseph F. Jiles currently is an inmate at the Waupun Correctional Institution in Waupun, Wisconsin. At all times relevant to this case he was confined at the Green Bay Correctional Institution in Green Bay, Wisconsin (GBCI).

Defendant Martha Breen-Smith is employed by the Wisconsin Department of Corrections as a psychologist at the Columbia Correctional Institution in Portage, Wisconsin. At all times relevant to this case, defendant Breen-Smith worked as a psychologist at GBCI. All other defendants are Department of Corrections employees working at GBCI. William Pollard is the warden. Michael Baenen is a deputy warden. Peter Ericksen is the security director. Sarah Cooper is a corrections program supervisor. Steven Schmidt is the psychologist service unit supervisor. Todd Hamilton is a psychologist and Mark Zimonick is a social worker.

GBCI has a segregation review committee that meets almost every week to discuss inmates of interest, including those in segregation with mental health issues, on observation status or with major behavioral issues. The committee consists of the program supervisor, a security supervisor, available psychological services unit staff, a health services unit staff member, the social worker, the psychiatrist when available and other unit staff. Sometimes, the committee decides to place an inmate on a behavior action plan. (The parties dispute the

purpose of a behavior action plan. Defendants allege that a behavior action plan is implemented only if an inmate engages in continual disruptive, destructive, assaultive or self-harming behaviors and regular measures such as warnings, conduct reports and placements under either a controlled or observation status failed to correct the inmate's behavior. Plaintiff alleges that behavior action plans are used as a way to circumvent ordinary methods of punishing inmates such as disciplinary segregation or conduct reports.)

While housed at GBCI, plaintiff engaged in destructive behavior, including damaging property in his cell, harming himself and inserting multiple objects into his penis. During July 2007, plaintiff was taken to St. Vincent's Hospital on at least two occasions to have foreign objects removed from his penis. Also in July 2007, plaintiff was placed on observation status. Observation status is a non-punitive, restrictive status used for the purpose of preventing an inmate from inflicting harm upon himself or someone else. Any property that an inmate can use to injure himself is removed to ensure his safety and security.

In late July or early August 2007, the segregation committee at GBCI decided to place plaintiff on a behavior action plan. (Defendant alleges that plaintiff was placed on the behavior action plan for his safety and the safety of others due to his history of destructive behavior and self harm, as well as his continued threats of self harm. Plaintiff alleges that he was placed on the plan as a punishment, and argues that he was not guilty of any misconduct and did not pose a threat to the safety of others.) Defendants Breen-Smith, Cooper, Hamilton, Schmidt and Zimonick were members of the committee in August 2007. Defendants Pollard, Baenen and Ericksen did not participate in the segregation committee meetings in August 2007, though they were notified that plaintiff was being placed on the behavior action plan.

Plaintiff was on the behavior action plan for approximately two weeks. (Defendant alleges that plaintiff was on the plan between August 7 and August 23, 2007. Plaintiff alleges that he was on the plan from July 31 to August 4, 2007, on observation from August 4 to August 13, 2007 and then back on a behavior action plan on August 13, 2007.)

As part of the behavior action plan, plaintiff's property was tightly restricted. He received a paper gown to wear. He was not given a mattress or blanket. He was given only one food item at a time (to receive the next food item, plaintiff had to return any container or bag from the previous item). He was given showers on regular shower days. (The parties dispute whether plaintiff ever received hygiene items such as soap, toothpaste, toothbrush or paper towels. Defendant alleges that plaintiff was given hygiene items on shower days. Plaintiff alleges that while he was on the behavior action plan, he never received soap, toothpaste or a toothbrush.) On plaintiff's behavior action plan, the segregation review committee noted that:

> Due to Mr. Jiles' history of destructive and abusive behavior and his record of following through with his threats of destruction*, any attempt or even a threat of destruction will result in an immediate observation or control placement. If he continues to report the destructive thoughts he will then be placed in 5 point restraints. If the act results in a placement at the city hospital, upon return Mr. Jiles will be placed in 5 point restraints immediately upon his return from the hospital. Upon release from restraint placement, Mr. Jiles may be placed in observation or control status as well as released back to his status prior to the most recent incident. The restraint placement shall be videotaped and all appropriate notifications and documentation will be made per SIMP 18.
>
> *Verbal threat include statements such as "I am going to bust this up . . . I am tired of this, I go'n to act up."

Plaintiff's behavior action plan was an initial plan that was regularly reviewed. The plan stated that "[m]odifications will be made as appropriate, to include giving more property and

4

privileges as behavior stabilizes, or taking more privileges and property away if your behavior remains unstable."

In August 2007, while he was on the behavior action plan, plaintiff was housed in the segregation unit. (The parties dispute the temperature of the cells. Defendant alleges that there is no air conditioning in the cells and that cells are maintained at a temperature of approximately 73 degrees during colder seasons. Plaintiff alleges that while he was on the behavior action plan, the cell was extremely cold due to cold air from a vent. He alleges that the air was so cold he had to walk all day to stay warm, and that he developed sores on his feet from walking on the cement floor.)

On August 4, 2007, while housed in segregation, plaintiff used his segregation mat to break the sprinkler head in his cell. Plaintiff was removed from his cell and placed in "5 point RIPP restraints." While in restraints, plaintiff complained to staff that he had something stuck in his penis. He was examined by a nurse who confirmed that plaintiff had an object in his penis, and he was taken to the hospital for treatment. After plaintiff returned to GBCI, he was sent back to his cell on the segregation unit and given a paper gown. He was placed on observation status.

On August 5, 2007, crisis intervention worker Jane Lagore saw plaintiff. Plaintiff told Lagore that the staff was trying to kill him. Lagore noted that plaintiff was alert, "oriented," fairly calm, cooperative and displayed no signs of mental illness other than his report that the staff wanted to kill him. Lagore decided to continue plaintiff's observation status.

On August 6, 2007, defendant Hamilton saw plaintiff for a follow-up review of his observation status. Plaintiff told Hamilton that he did not want to talk to him or anyone else.

Plaintiff turned his back toward Hamilton and began yelling and pounding on the door with his foot. Hamilton could not ascertain plaintiff's mental status. Hamilton decided to continue plaintiff's observation status.

On August 7, 2007, psychological associate Maleah Cummings saw plaintiff to review his observation status. Plaintiff told Cummings that he had continued thoughts of harm and intended to continue his destructive behavior. Plaintiff also said that he had auditory and visual hallucinations and had seen "demon dragons." Cummings observed no indication of hallucinations. Cummings noted that plaintiff was upset that the parole review commission was discussing a need for a sex offender assessment of plaintiff. Cummings decided to continue plaintiff's observation status.

On August 8, 2007, defendant Hamilton saw plaintiff for a follow-up visit. Hamilton noted that when plaintiff saw him, plaintiff shook his head and stared straight ahead. Plaintiff would not respond to Hamilton's questions. While looking at Hamilton, plaintiff began to urinate out the side of the cell door. Hamilton left. Hamilton decided to continue plaintiff's observation status.

On August 10, 2007, defendant Hamilton saw plaintiff again. Hamilton noted that plaintiff was pacing, talking fast and not making sense. Hamilton asked plaintiff if he was suicidal, and plaintiff responded: "always – you guys try to poison me." Plaintiff said that "we" needed to figure out what to do with him. Hamilton noted that plaintiff "did not endorse" any auditory or visual hallucinations. Hamilton decided to continue plaintiff's observation status.

(The parties dispute whether on August 11, 2007, plaintiff tore his paper gown into strips, made it "rope-like" and threw it at the sink and sprinkler head in his cell. Defendants

6

allege that staff observed this behavior. Plaintiff alleges that he only pretended like he was throwing pieces of his gown so that he could get a new gown.) On August 11, 2007, staff gave plaintiff a new paper gown.

On August 13, 2007, psychologist Mary Miller saw plaintiff. Miller noted that plaintiff was alert, oriented and denied thoughts of self-harm. Plaintiff denied auditory or visual hallucinations and suicidal or harmful thoughts. Miller noted that plaintiff had positive eye contact and "improved" judgment and impulse control. Miller concluded that plaintiff no longer presented a danger to himself and released him from observation status.

Also on August 13, the segregation review committee decided to continue plaintiff's placement on a behavior action plan.

On August 21, 2007, plaintiff attempted to damage his cell by pounding on the side of the toilet. He told staff he was going to "tear this thing up." He tied a piece of his paper gown around his face and told the staff that he had inserted objects into his penis. After disobeying several orders to come out of his cell, plaintiff told staff that he was going to "tear this place up and we were going to do this everyday." He said he wanted to stay at GBCI because he was going to sue the institution for keeping him in a cell with only a paper gown.

Eventually, plaintiff was restrained and removed from his cell. The nurse noticed an object protruding from plaintiff's penis approximately 3/4 an inch. (Defendant alleges that the object was a piece of plaintiff's paper gown. Plaintiff alleges that it was a piece of foil and wax paper.) Plaintiff was taken to St. Vincent's Hospital for treatment and he received a catheter. Upon his return from the hospital, he was placed on observation status and put in five-point restraints.

On August 22, 2007, psychologist Marie Miller saw plaintiff. Miller noted that plaintiff's judgment and impulse control appeared to be "improved" and that he denied any suicidal or homicidal "ideation."

On August 23, 2007, plaintiff was transferred to the Wisconsin Resource Center for emergency assistance in preventing plaintiff from removing the catheter that had been inserted at St. Vincent's Hospital.

While plaintiff was on the behavior action plan, he had the ability to request medical assistance. Between August 4, 2007 and August 23, 2007, health service unit staff saw plaintiff approximately 31 times. It is the general practice of health service unit staff to note a patient's significant problems or concerns in the patient's chart. At no point did health service staff make note on plaintiff's medical chart that he was suffering from severe back pain, severe neck pain, severe headaches or sores on his feet as a result of the conditions of his behavior action plan. (Plaintiff alleges that he did inform a nurse, whose name he cannot remember, that he had back pains, neck pain and sores on his feet.)

OPINION

**I. Summary Judgment Standard**

Under Fed. R. Civ. P. 56, summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In ruling on a motion for summary judgment, the admissible evidence presented by the nonmoving party must be believed and all reasonable inferences must be drawn in the nonmovant's favor. However, a party who bears the burden of proof on a particular issue may not rest on its

pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires a trial. *Hunter v. Amin*, 583 F.3d 486, 489 (7th Cir. 2009); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The applicable substantive law will dictate which facts are material. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). The court's function in a summary judgment motion is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249; *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007).

## II.  Eighth Amendment

The Eighth Amendment's prohibition of "cruel and unusual punishment" establishes the minimum standard for the treatment of prisoners by prison officials. Conditions in prison "must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

Plaintiff contends that placement in the behavior action plan violated his Eighth Amendment rights by imposing unconstitutional conditions of confinement on him. To succeed on his Eighth Amendment claim, plaintiff must establish two things. First, he must establish that the conditions under his behavior action plan were objectively serious. That is, he must show that the conditions deprived him of "'basic human needs' or 'the minimal civilized measure of life's necessities.'" *Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1996) (quoting *Rhodes*, 452 U.S. at 347)); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). Life's necessities may

include shelter and reasonable temperatures, *Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997), clothing and hygiene. *Gillis*, 468 F.3d at 493.

Second, plaintiff must prove that defendants acted with a culpable state of mind. *Wilson v. Seiter*, 501 U.S. 294, 302 (1991). The requisite state of mind is referred to as "deliberate indifference." *Farmer v. Brennan*, 511 U.S. 825, 828 (1970). A prison official is deliberately indifferent and may be held liable under the Eighth Amendment for having denied humane conditions of confinement "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. Thus, plaintiff must demonstrate that defendants "had actual knowledge of impending harm" that they "consciously refused to prevent." *Hill v. Shobe*, 93 F.3d 418, 421 (7th Cir. 1996).

*Gillis*, 468 F.3d 488, provides a benchmark for the analysis of an Eighth Amendment claim based on conditions of confinement. Indeed, plaintiff likens his conditions and treatment to those given to the inmate in *Gillis*. In that case, the inmate was placed in a punitive behavioral modification program for no reason other than violating a prison rule requiring him to sleep with his head toward the back of his cell. *Id.* at 489-90. For the first five days of the program, the inmate was deprived of human contact, left naked with no mattress or other bedding in a cell so cold that he paced 14 hours each day to stay warm, fed only a ground-up block of food and denied access to hygiene items such as toilet paper. *Id.* at 490-91. Like plaintiff, the inmate alleged that he developed sores on his feet and body from walking and lying on the cement floor. The following week he was allowed some clothing and regular meals but still was denied a mattress or bedding, and he was not allowed to shower until the ninth day of the program. *Id.* at 491. Further, the inmate could not return to normal conditions simply by

behaving himself; once the program was initiated, he was required to complete the entire course of punishment. *Id.* at 494-95. This evidence, the court of appeals concluded, was sufficient to permit the inmate to survive summary judgment on a claim that the conditions of his confinement were unconstitutional. *Id.* at 493-95. The court concluded that the evidence supported an inference that the inmate was denied the basic necessities of life and prison officials disregarded a substantial risk of serious harm to him. Evidence showed that officials may have used the behavior management plan to circumvent the requirements of Wis. Admin. Code § DOC 303, which governs prison discipline. *Id.* at 494.

Plaintiff's case is a "far cry" from *Gillis*. *E.g., Bowers v. Pollard*, 2009 WL 2971085, *5 (7th Cir. Sept. 17, 2009) (unpublished) (rejecting inmate's comparison to *Gillis* where inmate had a history of violent and self-abusive behavior, including a tendency to insert objects into his penis, and was put on behavioral action plan which restricted his property, limited his clothing and imposed five-point restraints on several occasions). First, the behavioral modification plan in *Gillis* was a punitive response to a minor infraction and the inmate was required to complete the entire twelve-day plan before returning to normal conditions. Here, in contrast, the restrictions imposed on plaintiff were non-punitive, instead designed to prevent him from harming himself or destroying property. The terms of plaintiff's plan were reevaluated on a regular basis, at least twice during the two-week period in question. The terms of the plan could be adjusted depending on plaintiff's behavior and mental state. Although the denial of basic items such as a mattress, blanket or clothing might seem harsh in the abstract, courts "cannot evaluate prison conditions in a vacuum." *Id.*, citing *Scarver v. Litscher*, 434 F.3d 972 (7th Cir. 2006:

> Federal judges must always be circumspect in imposing their ideas about civilized and effective prison administration on state prison officials. The Constitution does not speak with precision to the issue of prison conditions (that is an understatement); federal judges know little about the management of prisons; managerial judgments generally are the province of other branches of government than the judicial; and it is unseemly for federal courts to tell a state . . . how to run its prison system.
>
> *Litscher*, 434 F.3d at 976-77.

*See also Bruscino v. Carlson*, 854 F.2d 162,164-65 (7th Cir. 1988).

In this case, I must consider plaintiff's conditions of confinement in the context of his own behavior and other circumstances. So viewed, defendants' acts cannot be found unconstitutional. Plaintiff does not dispute his history of destructive behavior, including destruction of property and repetitive self harm. Before defendants placed plaintiff on the plan, they were forced to take him to hospital multiple times for removal of objects he had intentionally inserted into his penis. On August 4, 2007, plaintiff used his segregation mat to break the sprinkler in his cell so that he could insert the metal from the sprinkler into his penis. The terms of the plan, including the restriction that required plaintiff to wear only a paper gown, were intended to prevent this behavior.

Thus, even if I were to assume, *arguendo*, that plaintiff's conditions of confinement deprived him of basic human needs, this particular plaintiff in this particular case has no Eighth Amendment claim because he has not shown that defendants disregarded a substantial risk of serious harm to him. *E.g., Trammel v. Keane*, 338 F.3d 155 (2d Cir. 2003) (holding that defendants did not disregard substantial risk to inmate's safety by placing him on behavior action plan that "while indeed onerous, even harsh, was reasonably calculated to correct [the inmate's] outrageous behavior.") Quite the contrary: defendants instituted the plan in order to

*halt* plaintiff's relentless self-harm.  If defendants had *not* taken such drastic measures to constrain plaintiff, then he might well have succeeded in seriously injuring himself, which in turn would have exposed defendants to a lawsuit for failing to protect plaintiff from himself.  This observation highlights how far we have strayed from the constitutional heartland in this particular lawsuit. The Founding Fathers could not have foreseen the Eighth Amendment's use as a tool to mousetrap institution staff who are doing their best to deal with challenging inmates.

After putting plaintiff on the plan, defendants continued to demonstrate appropriate concern for his welfare.  While plaintiff was on the plan, he received six visits from psychological services staff (August 6, 7, 8, 10, 13 and 22, 2007).  Health services unit staff saw plaintiff 31 times during the same period.  The segregation review committee met regularly to discuss plaintiff's progress under the plan.  All of these facts establish defendants' concern for plaintiff's health and safety.  Plaintiff has not presented evidence from which a factfinder could conclude that the terms of the behavior action plan were anything other than a justified, well-tailored response to his repeated attempts to destroy property and to hurt himself.

Plaintiff also complains of conditions of confinement that were not specifically mandated by the behavior action plan, including the temperature of his cell and access to hygiene materials, but plaintiff has offered no evidence suggesting that the named defendants knew about these conditions.  Plaintiff alleges no interactions with defendants Cooper, Schmidt, Breen-Smith, Zimonick, Baenen, Ericksen or Pollard during August 2007, and has provided no basis from which a factfinder reasonably could infer that these defendants even were aware of the temperature in his cell or his lack of hygiene items, let alone evidence that they disregarded a substantial risk of harm.  *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir.

13

1995) ("To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.")

The only defendant who had personal interactions with plaintiff during August 2007 was defendant Hamilton. Hamilton met with plaintiff three times while he was on the behavior action plan (August 6, 8 and 10). However, there is no evidence that during these visits Hamilton had reason to believe that plaintiff was at a serious risk of harm from the behavior action plan, the temperature in his cell or his lack of personal hygiene items. To the contrary, the evidence shows that Hamilton believed plaintiff should remain in segregation under the terms of the plan to protect plaintiff from harming himself.

In sum, plaintiff had adduced no evidence that any of the defendants acted with a culpable mental state. Therefore, summary judgment may be entered for defendants on plaintiff's Eighth Amendment claim.

### III.  Fourteenth Amendment Procedural Due Process

Plaintiff contends that he was denied due process before he was placed on the behavior action plan and subjected to the conditions of confinement described above. To prevail on his due process claim, plaintiff must establish that he had a "liberty interest" in not being placed on the behavior action plan without notice and an opportunity to be heard. *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989). In *Sandin v. Conner*, 515 U.S. 472, 483-484 (1995), the Supreme Court held that liberty interests "will be generally limited to freedom from restraint which . . . imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." In the prison context, these protected liberty interests are

essentially limited to the loss of good-time credits or placement for an indeterminate period of time in one of this country's super-maximum security prisons, such as the Wisconsin Secure Program Facility. *E.g.*, *Wilkinson v. Austin*, 545 U.S. 209, 223-224 (2005). However, a period of disciplinary segregation may be "atypical and significant" "if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh." *Marion v. Columbia Correction Institution*, 559 F.3d 693, 697-98 (7th Cir. 2009). In the absence of a liberty interest, "the state is free to use any procedures it chooses, or no procedures at all." *Montgomery v. Anderson*, 262 F.3d 641, 644 (7th Cir. 2001).

The main problem with plaintiff's due process claim is that the conditions he complains of were not imposed to punish him, but to protect him from himself. *Sandin*, 515 U.S. at 486, applies to prison discipline, not measures instituted for the protection of the inmate. "[I]nmates have no liberty interest in avoiding transfer to discretionary segregation—that is, segregation imposed for administrative, protective, or investigative purposes." *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008). As I concluded above, there is no question that plaintiff was placed on the behavior modification plan for protective purposes. Thus, plaintiff did not have a liberty interest in avoiding placement under the plan.

This is not to say that the segregation review committee may place an inmate indiscriminately on a behavior action plan or indefinitely deprive him of clothing and property just so long as it claims this is for the prisoner's own good. At some point, this would raise questions whether the plan was imposed for punitive, rather than discretionary or protective purposes. But, of course, that is not what happened here. The segregation review committee had obvious, non-punitive reasons for placing plaintiff on the behavior action plan. The

committee did not place plaintiff on this plan for an indefinite–or even a significant–period of time. The Court of Appeals for the Seventh Circuit has affirmed dismissal of cases with significantly longer terms of segregation without requiring factual inquiry into the conditions of confinement. *E.g.*, *Townsend*, 522 F.3d at 766, 772 (59 days); *Hoskins v. Lenear*, 395 F.3d 372, 374-75 (7th Cir. 2005) (60 days). Plaintiff was on the plan for approximately two weeks. Such a short period on a discretionary behavior action plan, adopted for protective reasons, does not implicate due process rights.

ORDER

IT IS ORDERED that:

(1) The motion for summary judgment, dkt. 39, filed by defendants Martha Breen-Smith, Sarah Cooper, William Pollard, Pete Ericksen, Steven Schmidt, Todd Hamilton, Michael Baenen and Mark Zimonick is GRANTED.

(2) The clerk of the court is directed to enter judgment for defendants and close this case.

Entered this 7th day of December, 2009.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge